# IN THE UNITED STATES DISTRICT COURT
# FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| **CHARLENE WERWINSKI,** | : | **CIVIL ACTION** |
| Plaintiff | : | |
| | : | |
| v. | : | NO. 08-5605 |
| | : | |
| **INTERSTATE BRANDS CORP.,** | : | |
| Defendant | : | |

## M E M O R A N D U M

**STENGEL, J.** September 14, 2010

Charlene Werwinski brought this employment discrimination action against Interstate Brands Corporation alleging one count of sexual harassment in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e, *et seq*.[1] The defendant removed the case from the Court of Common Pleas of Philadelphia County, and upon termination of discovery, filed a motion for summary judgment pursuant to Rule 56 of the Federal Rules of Civil Procedure. For the following reasons, I will grant the motion in its entirety.

## I BACKGROUND[2]

The defendant is a wholesale baker and distributor of bread and cake snacks,

---

[1] Under 42 U.S.C. § 2000e-2(a)(1): it is an unlawful employment practice for an employer to fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to her compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin.

[2] The majority of facts are taken from the defendant's statement of undisputed material facts (Document #24-2), the plaintiff's response thereto, and her counterstatement of undisputed material facts (Document #28). The remaining facts are cited to the record where necessary.

including Wonder Bread and other products. The defendant hired Miss Werwinski in July 2000 as a production worker at its bakery in Philadelphia, and subsequently promoted her to Production Supervisor. Her responsibilities included overseeing the production of bakery products, quality control, the packing of products and completing required reports and paperwork.

In 2005, Robert Raimondo became Miss Werwinski's supervisor. The amended complaint alleges that Mr. Raimondo sexually harassed Miss Werwinski at work, including hugging her, kissing her neck, and touching her breasts on a weekly basis over a period from 2004 to 2007. While engaging in this conduct, Mr. Raimondo told her that he wanted to "f--k her" and "f--k her up the a-s." In response, Miss Werwinski told Mr. Raimondo to get away from her because "he's a married man." Miss Werwinski testified that these incidents typically lasted between "thirty seconds to a minute until she pushed [him] away." See Werwinski Dep. at 100.

Miss Werwinski also alleges that fellow-employee Robert McNamara overheard Mr. Raimondo make various inappropriate remarks to her. Mr. McNamara had been a Production Supervisor, the same position held by Miss Werwinski, but in July 2007, was promoted to interim Production Manager, a position he held until April 2009. In the latter position, he served as Mr. Raimondo's supervisor. Miss Werwinski testified that after Mr. McNamara was promoted, he was not present for any further inappropriate behavior by Mr. Raimondo. See Werwinski Dep. at 120. Mr. McNamara testified that he never

2

witnessed Mr. Raimondo make any inappropriate or offensive remarks to Miss Werwinski, and never witnessed him touch her in any manner.  See McNamara Dep. at 16.

During her years of employment with the defendant, Miss Werwinski never reported her allegations of harassment by Mr. Raimondo to anyone employed by the defendant.  The first time Miss Werwinski made anyone at the defendant aware of the alleged harassment by Mr. Raimondo was in April 2008, when her counsel sent the defendant a copy of the filed EEOC Charge of Discrimination.  Miss Werwinski claims that she chose not to report the alleged sexual harassment for almost four years because she was afraid of retaliation and losing her job.  When asked why she was afraid to report the alleged harassment, Miss Werwinski responded, "[b]ecause when I was married, my husband worked in the same kind of situation.  And he used to tell me all the time how they would just walk people out of there, management.  And I was just afraid.  I had it in my head."  Miss Werwinski's former husband never worked for the defendant.  She further responded that "when you work in a company and you're not in a union, there is no one there to protect you."  Miss Werwinski also indicated that in 2002, two former co-workers complained about harassment, and she believed that "other employees really treated them bad."

Miss Werwinski testified that she did, however, tell people outside of work about the harassment she allegedly suffered.  For example, in August 2007, Miss Werwinski

told her family physician, "my boss was touching me and saying rude remarks, kissing me." See Werwinski Dep. at 17. During the period when the alleged harassment was happening, she allegedly told her friends Donna Scott and Marie Ferraro, and her elder daughter Nicole. Id. at 110-111. At some point in 2008, she told her friend and former co-worker Genevieve Cants about the harassment. Id. at 30-33. The record is void of affidavits from these persons, or of other evidence to support the allegation that others were aware of the alleged harassment.

During the second week of November 2007, Miss Werwinski worked a double shift and subsequently was an hour late for her shift on the following day. See Werwinski Dep. at 59-60. At her deposition, Miss Werwinski described a heated argument she had with Mr. McNamara about her lateness during which he told her he had decided to change her shift to the "first shift" which typically starts after noon. Id. This infuriated Miss Werwinski who viewed the change in shift as unfair. Id. at 61. Because the argument occurred at the end of her shift, Miss Werwinski left work and returned home. Id. at 63. She called out sick for her next shift and never returned to work.[3] At her deposition, Miss Werwinski admitted that Mr. McNamara based his decision to change her shift on a number of factors among them his belief that employees learn a great deal on the first

---

[3] Miss Werwinski immediately took a leave of absence for severe depression and panic attacks. The defendant provided her with full short term disability benefits and paid her salary in full through April 18, 2008. The defendant did not terminate Miss Werwinski's employment and she did not quit her employment with the defendant. She believes that she is still employed by the defendant. See Werwinski Dep. at 121. Miss Werwinski has not sought any other employment since November 2007. Id. at 157.

4

shift. Although he told her this theory during the argument, she disagreed with him. Id. at 150. Mr. McNamara testified that he made the shift change because he wanted to cross train the supervisors. See McNamara Dep. at 24. He recalls that Miss Werwinski did not like the proposed change mainly because she did not want to work the evenings when her children would be home from school. Id. at 24-25. He also believes that Miss Werwinski never returned to work after that day. Id. at 27.

After receiving Miss Werwinski's EEOC Charge of Discrimination, the defendant contacted Veronica Blake-Greenaway, an attorney with over twenty years of employment law experience and an extensive background in conducting internal investigations in that area. The defendant asked Miss Blake-Greenaway to conduct an independent investigation of Miss Werwinski's allegations. In doing so, Miss Blake-Greenaway interviewed Miss Werwinski, Mr. Raimondo, Mr. McNamara, and Vincent Everman, the defendant's Human Resources Manager.

At his interview with Miss Blake-Greenaway, Mr. Raimondo described the relationship he had with Miss Werwinski as "convivial." See Werwinski Dep. at 142. He mentioned that during the summer of 2007, he tore the tendons in his ankle and someone left a "Walt Disney type 'Grumpy'" stuffed animal on his desk. Id. About a month later, Miss Werwinski acknowledged that it was she who had left the toy. When asked by Mr. Raimondo why she had done that, Miss Werwinski responded that it was because he was grumpy. Id. at 143-144.

Mr. Raimondo informed the investigator about another occasion when Miss Werwinski said to him, "You're miserable this morning, didn't you get laid?" Mr. Raimondo responded, "No, did you?" Id. at 145. At her deposition, Miss Werwinski acknowledged this exchange and characterized it as "basically a joke." Id. at 146. The record contains a memorandum from Fred Zolacha[4] to Mr. Raimondo criticizing him for his inappropriate handling of that incident. Mr. Zolacha informed Mr. Raimondo that he should have counseled or disciplined Miss Werwinski for making the initial comment, rather than to have responded in kind. He advised Mr. Raimondo that further similar conduct by him would be "met with strong disciplinary measures, up to and including termination of employment." See Def. Exh. P.

At the conclusion of her investigation, Miss Blake-Greenaway issued a report concluding, *inter alia*, that: (1) Miss Werwinski was well-versed in the defendant's policies prohibiting harassment in the workplace; (2) the fact that Miss Werwinski did not report the offensive conduct for four years was troublesome; (3) it was unreasonable for Miss Werwinski to fail to inform the defendant of her allegations; (4) the fact that Mr. Raimondo does not maintain that he never touched Miss Werwinski or other female employees is an indication of his credibility; (5) Miss Werwinski's allegations of retaliatory conduct by Mr. McNamara against her fail to establish any causal connection between the actions of which she complains and his observance of sexual harassment by

---

[4] Mr. Zolacha's title is not included in this memorandum. By the tone of the memorandum, I must assume that Mr. Zolacha's corporate rank is above that of Mr. Raimondo.

6

Mr. Raimondo; (6) the fact that she did not complain of Mr. McNamara's retaliatory treatment until six months after she began her leave is evidence that her allegations against Mr. McNamara are not plausible; (7) Mr. McNamara denied having observed the conduct that Miss Werwinski attributed to Mr. Raimondo; (8) the defendant has regularly trained its employees in the area of sexual harassment, and it is clear that the defendant takes this matter seriously; and (9) when an employee who clearly understands her obligation to report instances of sexual harassment fails to do so for four years, her credibility is necessarily compromised.

After exhausting her administrative remedies as required, Miss Werwinski filed a cause of action in the Court of Common Pleas in Philadelphia County. Upon removal, she filed an amended complaint alleging one count of sexual harassment seeking actual, compensatory, and punitive damages and injunctive relief.

## II  STANDARD OF REVIEW

Summary judgment shall be awarded "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." FED.R.CIV.P. 56(c). A dispute over a material fact is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). A factual dispute is "material" only if it might affect the outcome of the suit under governing law.

Id.

A party seeking summary judgment always bears the initial responsibility of informing the court of the basis for its motion and identifying those portions of the record that it believes demonstrate the absence of a genuine issue of material fact. Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986). Where the non-moving party bears the burden of proof on a particular issue at trial, the movant's initial Celotex burden can be met simply by "pointing out to the district court that there is an absence of evidence to support the non-moving party's case." Id. at 325. After the moving party has met its initial burden, "the adverse party's response, by affidavits or otherwise as provided in this rule, must set forth specific facts showing that there is a genuine issue for trial." FED.R.CIV.P. 56(e). Summary judgment is appropriate if the non-moving party fails to rebut by making a factual showing "sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." Celotex, 477 U.S. at 322. All inferences must be drawn and all doubts resolved in favor of the nonmoving party. United States v. Diebold, Inc., 369 U.S. 654, 655 (1962); Gordon v.Youmans, 358 F.2d 261, 262 (2d Cir. 1965); Gans v. Mundy, 762 F.2d 338, 341 (3d Cir. 1985); Liberty Lobby, 477 U.S. at 255. The court must decide not whether the evidence unmistakably favors one side or the other but whether a fair-minded jury could return a verdict for the plaintiff on the evidence presented. Liberty Lobby, 477 U.S. at 252. If the non-moving party has met the extraordinarily low burden of evidence and

offered a genuine issue of material fact, then the court cannot credit the movant's version of events against the opponent, even if the quantity of the movant's evidence far outweighs that of its opponent. Big Apple BMW, Inc. v. BMW of North America, Inc., 974 F.2d 1358, 1363 (3d Cir. 1992).

## III  DISCUSSION

A plaintiff can establish a violation of Title VII by proving that discrimination based on her sex created a hostile or abusive work environment. Meritor Sav. Bank, FSB v. Vinson, 477 U.S. 57, 66 (1986). Not all workplace conduct that may be described as harassment, however, rises to the level of a hostile work environment. The harassment must be "sufficiently severe or pervasive to alter the conditions of the [plaintiff's] employment and create an abusive working environment." Id. at 67. The plaintiff must subjectively perceive the environment to be hostile or abusive, and conditions must be such that a reasonable person would have the same perception." Konstantopoulos v. Westvaco Corp., 112 F.3d 710, 715 (3d Cir. 1997). A court uses a totality of the circumstances test to determine whether the threshold level of severity and pervasiveness has been reached, and consider such factors as the severity of the harassment, the frequency of the harassment, and the degree of abuse. Harris v. Forklift Systems, Inc., 510 U.S. 17, 23 (1993). Furthermore, an employer is generally liable for the acts of a supervisory employee whose sexual harassment of a subordinate has created a hostile work environment. Huston v. Procter & Gamble Paper Prods. Corp., 568 F.3d 100, 104

(3d Cir. 2009); see also Faragher v. City of Boca Raton, 524 U.S. 775, 807 (1998); Burlington Industries, Inc. v. Ellerth, 524 U.S. 742, 765 (1998). Accordingly, in order to prevail, a plaintiff must also prove that there is a basis for employer liability. Id.

To hold an employer vicariously liable for the harassing conduct of one of its supervisors, it must be shown that the supervisor was "aided in accomplishing the tort by the existence of the agency relation." Ellerth, 524 U.S. at 759 (quoting Section 219(2)(d) of the Restatement (Second) of Agency). In some cases, however, an employer is allowed to establish an affirmative defense to vicarious liability:

> An employer is subject to vicarious liability to a victimized employee for an actionable hostile environment created by a supervisor with immediate (or successively higher) authority over the employee. When no tangible employment action is taken, a defending employer may raise an affirmative defense to liability or damages, subject to proof by a preponderance of the evidence, see Fed. Rule Civ. Proc. 8(c). The defense comprises two necessary elements: (a) that the employer exercised reasonable care to prevent and correct promptly any sexually harassing behavior, and (b) that the plaintiff employee unreasonably failed to take advantage of any preventive or corrective opportunities provided by the employer or to avoid harm otherwise. . . . No affirmative defense is available, however, when the supervisor's harassment culminates in a tangible employment action, such as discharge, demotion, or undesirable reassignment.

Ellerth, 524 U.S. at 765; Faragher, 524 U.S. at 807-808. Here, it is important to note that the defendant maintains that the alleged harassment never occurred; and further that Mr. Raimondo adamantly denies that he sexually harassed Miss Werwinski. Nevertheless, in its motion, the defendant does not address whether Miss Werwinski has satisfied each

10

element of a *prima facie* case of employment discrimination based on sexual harassment or hostile work environment.[5] Instead, it asserts for purposes of the motion that even if a *prima facie* case were successfully established, it would avoid liability by asserting the Faragher/Ellerth affirmative defense. Because no tangible employment action[6] was taken against Miss Werwinski, this defense is available to the defendant.

**A. First Prong of the Faragher/Ellerth Defense**

The defendant can avoid liability for Mr. Raimondo's alleged conduct by first showing that it had exercised reasonable care to avoid harassment and to eliminate it should it occur. Faragher, 524 U.S. at 805; see also Ellerth, 524 U.S. at 765. The plaintiff argues that this prong of the Faragher/Ellerth defense cannot be satisfied because the defendant had constructive notice of the alleged harassment. Miss Werwinski maintains that because Mr. McNamara witnessed some of the inappropriate conduct

---

[5] To prove such a *prima facie* case, a plaintiff must establish five elements: (1) she suffered intentional discrimination because of her sex; (2) the discrimination was severe or pervasive; (3) it detrimentally affected her; (4) it would detrimentally affect a reasonable person in like circumstances; and (5) there is a basis for employer liability. Huston v. Procter & Gamble Paper Prods. Corp., 568 F.3d at 104.

[6] The Supreme Court has defined a tangible employment action as "a significant change in employment status," often, but not always, resulting in economic injury. Ellerth, 524 U.S. at 761-762; see also Faragher, 524 U.S. at 808. "A tangible employment action [is] also defined by reference to a non-exclusive list of possible actions: 'hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing a significant change in benefits.'" Suders v. Easton, 325 F.3d 432, 434 (3d Cir. 2003). Miss Werwinski admits that she did not suffer any adverse action by Mr. Raimondo with regard to the terms and conditions of employment as a result of rejecting his alleged sexual advances. See Werwinski Dep. at 139. Miss Werwinski further admits that Mr. Raimondo never told her that she would be fired or penalized in any manner if she refused to succumb to his alleged advances. Id.

11

directed towards her, his knowledge was imputed to the employer once Mr. McNamara was promoted to interim Production Manager. Under the circumstances of this case, I cannot agree.

The plaintiff cites no authority for her proposition that knowledge acquired earlier by an employee could be imputed to the employer after the employee is promoted to management. My review of our nation's caselaw, however, uncovered a few basic tenets applicable here.

Generally, the law imputes to the principal all notice or knowledge concerning the subject-matter of the agency which the agent acquires while acting as agent and within the scope of his authority, and this includes, subject to certain exceptions, notice or knowledge which he may have acquired previously. Fowler v. Latham, 38 S.E. 2d 732, 737 (Ga. 1946). A principal is charged with the knowledge an agent acquired before the relationship only when it is clearly shown that the knowledge was in the mind of the agent while acting for the principal or where he acquired it so recently as to raise the presumption he still retained it in his mind. First Palmetto Savings Bank v. Patel, 543 S.E. 2d 241, 244 (S.C. App. 2001); see also Chicagoland Vending, Inc. v. Parkside Ctr., Ltd., 454 S.E.2d 456, 458 (Ga. 1995) (agent's previously acquired knowledge imputed to subsequent principal only when agent has it in mind in dealing for subsequent principal or acquired knowledge so recently as to warrant assumption that agent's mind still retained it); Pee Dee State Bank v. Prosser, 367 S.E.2d 708, 714 (S.C. App. 1988), *overruled in*

*part on other grounds*, 446 S.E.2d 415 (S.C. 1994) (principal charged with knowledge agent acquired before relationship only when it can be reasonably said to have been in the mind of the agent when acting for the principal or where he acquired it so recently as to raise the presumption he still retained it in his mind); Aiken Petroleum Co. v. National Petroleum Underwriters, 36 S.E. 2d 380, 385 (S.C. 1945) (same); McSweeney v. Prudential Ins. Co. of America, 128 F. 2d 660, 665 (4th Cir. 1942), cert. den., 317 U.S. 658 (1942) (same); Constant v. University of Rochester, 19 N.E. 631, 634 (N.Y. 1889) (principal charged with knowledge agent earlier acquired in another transaction for another principal only "upon clear proof" information was present to his mind at the very time of the transaction in question).

Here, that Mr. McNamara was aware of Mr. Raimondo's alleged sexual harassment of Miss Werwinski is supported only by Miss Werwinski's bald assertions. Mr. McNamara denied having such knowledge. In fact, there is no other evidence to suggest that Mr. McNamara might have been aware of the alleged harassment. Thus, the record lacks the requisite clear proof that such knowledge was in Mr. McNamara's mind when he became the interim Production Manager. Further, because Miss Werwinski was unable to provide specific dates or a more definite time frame within which any knowledge of untoward behavior may have been acquired by Mr. McNamara, any presumption of retention must also fail. Accordingly, I find that the defendant did not have constructive notice of the alleged sexual harassment.

There is overwhelming evidence in the record, however, to support a finding that the defendant satisfies the first prong of the Faragher/Ellerth defense. In 2000, the defendant published its Equal Employment Opportunity Policy which it disseminated to employees multiple times since its publication. The Policy contains a prohibition of sexual harassment, a complaint procedure with local management contact information, and a prohibition of retaliation. The January 2006 version of the Policy contains the following statement in bold lettering: "Do not wait until a situation is severe or pervasive; report any possible discrimination or harassment as soon as you know of it." The defendant has also conducted extensive training on its EEO Policy and its prohibition of sexual harassment in the workplace. In fact, the defendant conducted Policy training no less than five times between June 2002 and January 2006. The training, which was mandatory for all managers and supervisors, included receipt and review of the EEO Policy, an overview of the harassment policy and complaint procedure, videos and power point presentations, interactive CD-Rom courses on diversity in the workplace and testing on the EEO Policy. Also included were discussions of what an employee should do if she experiences what she believes is harassment in the workplace.

The defendant has a comprehensive and thorough EEO Policy in place, and has diligently and effectively continued to disseminate its policy against sexual harassment and retaliation among its employees. This evidence reflects the defendant's reasonable efforts to discharge its affirmative obligation to prevent Title VII violations.

Accordingly, I find that the first prong of the Faragher/Ellerth defense is satisfied.

   **A. Second Prong of the Faragher/Ellerth Defense**

The second prong of the affirmative defense requires the defendant to show that Miss Werwinski failed to act with like reasonable care to take advantage of the defendant's safeguards and otherwise to prevent harm that could have been avoided. Faragher, 524 U.S. at 805; see also Ellerth, 524 U.S. at 765. The Supreme Court provided the following rationale in establishing this prong:

> The requirement to show that the employee has failed in a coordinate duty to avoid or mitigate harm reflects a policy imported from the general theory of damages, that a victim has a duty "to use such means as are reasonable under the circumstances to avoid or minimize the damages" that result from violations of the statute. Ford Motor Co. v. EEOC, 458 U.S. 219, 231 n. 15 (1982). An employer may, for example, have provided a proven, effective mechanism for reporting and resolving complaints of sexual harassment, available to the employee without undue risk or expense. If the plaintiff unreasonably failed to avail herself of the employer's preventive or remedial apparatus, she should not recover damages that could have been avoided if she had done so. If the victim could have avoided harm, no liability should be found against the employer who had taken reasonable care, and if damages could reasonably have been mitigated no award against a liable employer should reward a plaintiff for what her own efforts could have avoided.

Faragher, 524 U.S. at 806-807 (internal citations omitted).

Here, the record contains an abundance of evidence to support a finding that the defendant also satisfies this prong. Miss Werwinski acknowledged that the defendant provided her with its EEO Policy in 2000, 2002, and 2006, and that she was fully aware

15

of the defendant's policies. Even at her orientation with the company in 2000, Miss Werwinski became aware that the defendant's EEO Policy contained a prohibition of sexual harassment, that it followed a strict "no tolerance" policy on sexual harassment, and that the EEO Policy also contained a complaint procedure whereby an employee who believed she was being sexually harassed could contact a named human resources representative. She was repeatedly provided training on the defendant's Policy. The record contains evidence that she attended such training on at least the following dates: June 10, 2003; August 23, 2003; September 9, 2004; and January 12, 2006. The training included videos and printed materials and stressed what an employee should do if she believed she was being harassed. In fact, during one of the classes, Miss Werwinski scored 100 on a test which included questions on harassment in the workplace. At the June 2002 training, Miss Werwinski signed a document titled "I Understand" in which she acknowledged that she understood the defendant's policy statements on workplace harassment, anti-harassment, and sexual harassment. She further acknowledged in that document that she understood "what harassment is and what I should do if I feel I am being harassed," and that she would "not be retaliated against for reporting harassment or assisting in a harassment investigation." The defendant also notified its employees of its hotline which employees could call to report any unacceptable behavior. Miss Werwinski admitted to having never called that hotline. Miss Werwinski even testified at her deposition that she was fully aware that the defendant's EEO Policy contained its

prohibition against harassment, its complaint procedure, and local management contact information, and a phone number for reporting harassment. It identified Human Resources Manager Vince Everman, and Patricia Corcoran as persons to contact if an employee believed she were subjected to harassment. Miss Werwinski never reported the alleged harassment to either Mr. Everman or Miss Corcoran.

In fact, even when given the opportunity, Miss Werwinski repeatedly refused to tell Mr. Everman what was allegedly happening despite his attempting to investigate why she did not return to work. Mr. Everman telephoned Miss Werwinski in December 2007. See Werwinski Dep. at 24-25. At her deposition, when asked what was said during that conversation, Miss Werwinski replied,

> "It was about what was going on in work. He wanted me to come to my job to speak to him. And I told him I couldn't do it; I couldn't go there. He wanted me to meet him for lunch somewhere. And I told him no. I was afraid to lose my job.
>
> . . .I was crying. I said to him you have no idea what is going on there. He wanted me to tell him. And I was afraid to tell him. I didn't want to lose my job."

Id. at 25. When asked what Mr. Everman said in response, Miss Werwinski said, "I don't remember. I don't recall now because I was crying so much." Id. at 27. Finally, when asked whether Mr. Everman had said that she would not lose her job if she were to speak with him, Miss Werwinski replied, "Not in those words." Id.

During the same time period when she claims she was being sexually harassed by Mr. Raimondo, Miss Werwinski received continual training on the defendant's EEO

17

Policy. She was fully apprised that the defendant did not tolerate retaliation against anyone who reported harassment. Notwithstanding all of this training and knowledge of the defendant's policies, Miss Werwinski still chose to not take advantage of the defendant's safeguards. She could have notified the defendant's management contact persons, but did not. She could have called the defendant's hotline, but did not. She could have told Mr. Everman when he repeatedly pressed her on the telephone, but did not. This failure to avail herself of the defendant's preventive/remedial apparatus fits squarely into the scenario contemplated by the Supreme Court when it established the second prong of the Faragher/Ellerth defense. Accordingly, I find that this asserted affirmative defense shields the defendant from liability for the alleged actions of Mr. Raimondo directed toward Miss Werwinski.

In conclusion, although Title VII seeks to make persons whole for injuries suffered because of unlawful employment discrimination, its primary objective is not to provide redress but to avoid harm. Faragher, 524 U.S. at 806. Here, that objective is achieved by the defendant's providing an effective mechanism for reporting and resolving complaints of sexual harassment available to all its employees without undue risk or expense. Miss Werwinski could have avoided the harm by availing herself of that mechanism, but she chose not to do so. If the alleged harassment happened as she says, Miss Werwinski has come forward with no proof of an adverse employment action. While Mr. Raimondo's comments, as described, were certainly out of bounds in the workplace, they were, apart

18

from sheer offensiveness, of no consequence.  She alleges no unfair treatment, no pattern of such activity, and no policy or pattern of tolerating sexual comments by one employee to another.  Looking back more than four years after the start of the alleged harassment, she bases this Title VII claim on her understandable and justifiable umbrage at these comments.  Absent an adverse employment action of some kind and in light of the Faragher/Ellerth defense, Miss Werwinski has failed to meet her Celotex burden of making a factual showing that there is a genuine issue for trial.  Celotex, 477 U.S. at 322.  Accordingly, I will grant the defendant's motion and enter judgment in its favor.

    An appropriate Order follows.